**UZICH v. E. & G. BROOKE IRON CO. et al.**
**Civ. A. No. 6424.**

District Court, E. D. Pennsylvania.

Aug. 20, 1947.

Thomas Z. Minehart and Maurice A. Bank, both of Philadelphia, Pa., for plaintiff.

Raymond A. White, Jr. of Philadelphia, Pa., for defendant A. E. Anderson Const. Corp.

KIRKPATRICK, District Judge.

This is a motion for judgment under Rule 50(b), 28 U.S.C.A. following section 723c. The action was for personal injuries alleged to have been caused by the defendants' negligence. The jury was unable to agree and was discharged.

The plaintiff, an experienced steeplejack-painter, employed by an independent contractor, was injured while painting a structure called a "stove", a circular iron tower 90 feet in height, having a sloping or dome-like roof, topped by a platform with a railing around it. It was part of the plant of the Brooke Iron Company. Em-

ployees of the Anderson Construction Corporation, another independent contractor, were, at the same time, engaged in putting in a new brick lining.

The plaintiff at the time of the accident was engaged in painting the roof, lying full length upon it, holding onto the railing of the platform with one hand, wielding the brush with the other and slowly working himself around as he painted. The roof extended about six feet from the platform to its lower edge, so that it was possible for him to cover the entire width in this manner.

At one point a steel arm extended out over the roof, from the floor of the platform, about four feet. Attached to its outer end was a pulley. A cable ran diagonally up from a drum operated by a motor on the ground some 125 feet from the stove, over the pulley, and then straight down into the stove through a small hole in the convex roof about midway between the platform and the edge. This rig was for the purpose of hoisting bricks inside the stove, where the Anderson men were working.

The arm and cable obstructed the plaintiff's progress around the roof. When he came to it, he painted for a while with one foot resting on the cable. Then in order to get past the obstruction, he let go the railing, slid down about two feet, grasped the cable, and started to move around on the outside of it. At this moment the Anderson man on the ground started the motor and the cable was drawn rapidly upward. The plaintiff, whose only support it was, was unable to let go and his hand was drawn into the pulley and injured.

■ The testimony of the plaintiff himself, in the light of the undisputed facts, demonstrates beyond all doubt that he was contributorily negligent. Granting that he had to get on the other side of the cable in order to finish the job, and even provisionally agreeing with his counsel that that fact might, if there was no other way to do it, have justified his taking some risk (an extremely doubtful proposition), it is perfectly clear that the danger which he incurred and which resulted in the accident could have been entirely avoided without preventing his finishing his work. He needed only to have pulled himself up on the platform and let himself down on the other side of the steel arm. There was no necessity whatever for his attempting to pass around the cable on the outside.

■ "Where a person, having a choice of two ways, one of which is perfectly safe, and the other of which (he knows) is subject to risks and dangers, voluntarily chooses the latter and is injured, such person is guilty of contributory negligence and cannot recover." Smith v. City of Pittsburgh, 338 Pa. 216, 217, 12 A.2d 788. Of course there was no absolutely safe way to do the plaintiff's job. Even had he used a rope, safety belt or boatswain's chair, I should hesitate to call it safe. However, he could have done it without the slightest risk of being injured in the way he was. The choice was between an at least comparatively safe way and one that was highly dangerous.

It cannot be questioned that the plaintiff was fully aware of the possibility of the cable starting to move when he chose it as his sole support as he lay on the sloping convex dome at the top of this ninety-foot tower. The plaintiff had seen the motor in operation on this particular stove for about a week. The Anderson superintendent, called by the plaintiff, (the defendant offered no testimony) testified that for five days the motor and cable had been operated at this stove four times every fifteen minutes, eight hours a day. This testimony was not contradicted by the plaintiff's own testimony except as to the twenty-minute period immediately before the accident. Beyond that, it is, if anything, supported by the plaintiff's testimony that he saw the engineer operate the motor, "Q. And that you saw him do every day? A. Yes, sir."

The plaintiff knew the purpose for which the motor was used.

"Q. What was the purpose of this motor? A. I think it was for that cable or anything else.

"Q. What? A. Could be something else.

"Q. Was it for the cable or what? A. It have to be for the cable; I figure that, see. * * *

"Q. The cable was attached to a drum, which was attached to the clutch of the motor? A. Well, I think so."

True, he testified that for 20 minutes before the accident the cable had been stationary and that he had not actually seen it move or heard the motor run at any time previously on the day of the accident; but he could have seen the operator standing beside the motor, had he looked, and he must have known that there was always a risk that it would be started and must have known what would happen if it was.

There was no evidence that the motor operator saw the plaintiff at work or even knew that there were men on the roof; and there was no reason why he should have suspended work if he had. The cable in moving up or down through the small aperture could not possibly have injured such men so long as they did not take hold of it. The plaintiff testified that before he grasped the cable (that is, while he was holding onto the railing) he was "perfectly safe" and it follows that he would have remained "perfectly safe" had he passed around the cable and arm via the platform. He could have left unpainted enough of the roof on the near side of the cable to have allowed him to do this without getting into the fresh paint, and then have painted that part from the other side, since, as he testified, he had about a three-foot reach.

Ropes and a boatswain's chair were available on the premises, but there was a dispute as to whether it would have been possible to use a boatswain's chair on the convex roof, and, for the purpose of this opinion, it may be assumed that it was not.

Of course the job of a steeplejack-painter is at best a very risky one, and perhaps the standards of care for workmen in ordinary occupations should not be applied to it too rigidly, but making all due allowances for the type of work he was doing, when the plaintiff, with a sheer drop of ninety feet below him, committed his safety to a handhold on the cable, he was taking a risk which comes pretty close to being foolhardy.

 The sudden emergency doctrine clearly does not apply, as it might have done had he been slipping and grasped the cable to save himself. His testimony makes it plain that there was no such necessity and that the only reason he did it was to get past the obstruction. It was probably a little less trouble to do it the way he did than to take the safe way.

The defendant has argued that no negligence was shown on the part of the operator of the motor, but it is unnecessary to decide this point in view of the plaintiff's testimony.

Judgment may be entered for the defendant.